UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SULZER MIXPAC AG,

Plaintiff,

-against-

DXM CO., LTD. and DENTAZON CORPORATION,

Defendants.

No. 19 Civ. 9404 (LAP)

OPINION AND ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is Plaintiff Sulzer Mixpac AG's ("Mixpac")[1] motion to dismiss nine counterclaims filed by Defendants DXM Co., Ltd. and Dentazon Corporation (collectively, "DXM").[2] For the reasons set forth below, the motion is GRANTED.

**BACKGROUND**

The following facts are drawn from the Amended Counterclaims, the documents integral to them, this Court's prior orders, and the public records of TTAB proceedings, of which the Court takes judicial notice. The Court assumes the allegations to be true and

[1] The parties sometime refer to Plaintiff by Mixpac’s parent company, Medmix. For consistency with its prior rulings, the Court will refer to Plaintiff as Mixpac.

[2] "Mot." and "Mot. Ex." refer to Mixpac's memorandum and exhibits, Dkts. 147 and 147-1 through 147-6; "Opp." to DXM's opposition, Dkt. 148; "Reply" to Mixpac's reply, Dkt. 152; "Am. Countercl." and "Am. Ans." to the counterclaims and answer in Dkt. 145; "Compl." to the Complaint, Dkt. 1, and its exhibits; and "Initial Countercl." to Dkt. 25.

draws all reasonable inferences in DXM's favor. Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir. 2012).[3]

**A. The Parties and the Candy Color Registrations**

Mixpac is a Swiss corporation that manufactures a system for mixing two-part dental adhesives. That system includes a dispensing gun, a cartridge, and, as is relevant to this litigation, disposable mixing tips. (Compl. ¶¶ 1, 12.) For more than twenty years Mixpac has sold those disposable tips in six colors (yellow, teal, blue, pink, purple, and brown), which Mixpac dubs its "Candy Colors." (Id. ¶¶ 13–15.)

DXM, meanwhile, is a Korean corporation and owner of Dentazon, a U.S.-based manufacturer. DXM manufactures and sells identical dental-mixing tips to those manufactured by Mixpac. (Compl. ¶¶ 2–3; Am. Ans. at 3–4.)

Mixpac holds United States trademark registrations for the Candy Colors as applied to disposable mixing tips, their lower portions, and cartridge caps. Each registration claims a named color "as a feature of the mark" in combination with a "dome-façade tip" configuration. (Compl. ¶¶ 18–20 & Exs. B–D.) DXM identifies twenty-four such registrations, which it defines

[3] The Settlement Agreement and the Consent Injunction are integral to both the Complaint and the Amended Counterclaim and thus properly considered in their entirety for the purposes of this motion. The Court also considers the filings in the Cancellation Proceeding, but only to establish that they were made and what they state. Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006). The Court does not rely, for their truth, on Mixpac's Exhibits D and E or the exhibits to its Reply.

collectively as the "Candy Color Registrations." (Am. Countercl. ¶ 8.)

**B. The 2015 Lawsuit and the Settlement**

In 2015, Mixpac sued DXM in this District for infringing the Candy Color Registrations by selling colored tips at the Greater New York Dental Meeting. Sulzer Mixpac AG v. DXM Co., No. 15 Civ. 9359 (ER) (S.D.N.Y.) (the "2015 Action"). DXM initially argued in its answer that the Candy Colors were functional and the registrations therefore invalid. (Am. Ans. at 1.) Ultimately, however, DXM opted not to litigate the issue of functionality. Instead, DXM agreed to resolve the 2015 Action via the Settlement Agreement and related Consent Judgment and Permanent Injunction, which Judge Ramos entered on June 16, 2016 (the "Consent Injunction"). (Compl. ¶¶ 25-35 & Ex. A; Am. Ans. ¶¶ 25-35.)

Under the terms of the Consent Judgment, DXM agreed to sell only "new mixing tips that do not include the Candy Colors in any manner and have two (2) wings or four (4) wings in the lower portion of the mixing tip (the 'New Mixing Tips')." (Compl. ¶ 25; Am. Ans. ¶ 25.)[4] DXM further "agree[d] not to manufacture, import, distribute, ship, advertise, or offer for sale the Accused Mixing Tips, or other mixing tips which create a likelihood of confusion

[4] The Settlement Agreement is confidential and filed under seal. (See Summary Judgment Order at 2 & n.3; PI Order at 4 n.2.) The Court quotes its terms as they appear in the parties' pleadings, whose accuracy DXM has admitted, (Am. Ans. ¶¶ 25, 61), and in its own prior orders.

with the Colored Dome Mark, the Candy Colors, or the Mixpac Trademark Registrations worldwide." (Dkt. 128 (the "Summary Judgment Order") at 4 (quoting Settlement Agreement ¶¶ 5, 8).) Finally, DXM agreed expressly "never to challenge or assist others in challenging the validity of" the registrations unless Mixpac sued over a different product. (Am. Ans. ¶ 61.) To that end, the Consent Injunction dismissed DXM's then-pending counterclaims—which included antitrust and functionality claims—with prejudice. (Id. at 2-3; Compl. ¶ 34; Am. Ans. ¶ 34.)

**C. Instant Action and the Preliminary Injunction**

As the Settlement Agreement contemplated, DXM initially sold color-compliant tips. (Compl. ¶ 36; Am. Ans. ¶ 36.) Sometime after, however, DXM began selling tips with enlarged, colored "wings" in the lower portion, in yellow, teal, blue, and pink:



DXM admitted to selling these ostensibly "new" tips but denied that these colors were the Candy Colors prohibited specifically by the Consent Injunction. (Compl. ¶¶ 39, 45-47; Am. Ans. ¶¶ 39, 46-47). Mixpac promptly filed a second action before this Court in

October of 2019, asserting breach of the prior Settlement Agreement and of the Consent Injunction (Counts One and Two); infringement of the registered Candy Colors, counterfeiting, false designation of origin, and common-law infringement (Counts Three through Six); and common-law unfair competition (Count Seven). (Compl. ¶¶ 60-107.) DXM, in response, asserted five counterclaims seeking declarations of non-infringement and of functionality and separately alleging various antitrust violations, unfair competition, and tortious interference by Mixpac. (Dkt. 25 (the "Initial Counterclaims").)

On July 2, 2020, the Court granted Mixpac's motion for a preliminary injunction. (Dkt. 62 (the "PI Order"). The PI Order found that the accused tips were "a near carbon copy of the 'New Mixing Tips' that were permitted by the 2016 Settlement Agreement" and that what DXM had agreed to "was not to use the Candy Colors 'in any manner'—precisely what they are doing here." (PI Order at 15, 17 & n.5.) The Court therefore enjoined DXM from selling "any other dental mixing tips that bear the Mixpac Candy Colors in any manner" and from "[a]ssisting, aiding, or abetting any other person or entity" in doing so. (Id. at 18.)

**D. A&N Trading and the Cancellation Proceeding**

Separate from this lawsuit against DXM, Mixpac concurrently sued another competitor, A&N Trading Company, over A&N's use of the same Candy Colors. Following a bench trial, Judge Kaplan

entered judgment for Mixpac in August of 2019, finding that the colors at issue were non-functional and thus protectable trade dress. (Compl. ¶ 55 & Ex. L); Sulzer Mixpac AG v. A&N Trading Co., 988 F.3d 174, 180 (2d Cir. 2021). In February of 2021, however, the Court of Appeals reversed the judgment, concluding that the trial evidence established that the colors signify diameter and thus were functional, rendering Mixpac's trade dress unprotectible. A&N Trading, 988 F.3d at 183. However, notwithstanding the Court of Appeals decision in A&N Trading, no order cancelling any Candy Color Registration has issued or been certified to the United States Patent and Trademark Office (the "USPTO") by Judge Kaplan, presumably because neither party requested it on remand. (Mot. at 4-5, 8, 12-13; Opp. at 8, 13.)

Separately, on October 15, 2019, DXM petitioned the Trademark Trial and Appeal Board (the "TTAB") to cancel the Candy Color Registrations as functional. (Am. Ans. at 3); Cancellation No. 92072551 (the "Cancellation Proceeding"). Both parties reported the Court of Appeals' decision in A&N Trading to the TTAB in April 2021, and in 2022 DXM asked the TTAB to enter judgment against each of Mixpac's registrations. (Mot. Exs. A-C.) The TTAB declined, reasoning that "the A&N Case [before Judge Kaplan] has not been finally determined," and deferred ruling pending the final determination of that case. (Mot. Ex. C at 2.)

**E. The Court's Summary Judgment Decision**

On September 15, 2022, the Court resolved the parties' cross-motions. (Dkt. 115 (the "September 2022 Order")); Sulzer Mixpac AG v. DXM Co., No. 19 Civ. 9404 (LAP), 2022 WL 4280343 (S.D.N.Y. Sept. 15, 2022). The Court agreed with DXM that following A&N Trading, Mixpac would normally be "estopped from relitigating the functionality of the Candy Color marks." (Id. at 12-13, 16, 28.) However, the Court rejected DXM's argument that the Court of Appeals decision undid the settlement to which DXM had voluntarily agreed prior to A&N Trading. DXM, the Court observed, "had the option not to settle" and litigate the issue of functionality. (Id. at 15-16.) Put simply, "a deal is a deal," which the Court enforced accordingly. (Id. at 16-18.)

As is relevant here, the September 2022 Order also dismissed DXM's Initial Counterclaims, holding that (i) DXM's claim for non-infringement was a "mirror image" of Count Three; (ii) any arguments as to functionality were moot except as to Registration No. 4,051,261; (iii) DXM's antitrust and unfair competition counterclaims were precluded under Noerr-Pennington insofar as they rested on "sham litigation"; and (iv) DXM's tortious interference counterclaim failed to state a claim. (Id. at 20, 23-24, 26.) The Court also struck the Sixth Affirmative Defense of unclean hands, which did "not even go so far as to identify

which specific conduct has left Plaintiff with 'unclean hands.'" (Id. at 27-28.)

With DXM's counterclaims dismissed, years of discovery into Mixpac's affirmative claims followed. In July of 2024, the Court granted Mixpac summary judgment on Count One. Adhering to the construction adopted in the PI Order and the September 2022 Order, the Court held that no reasonable reading of the Agreement would permit DXM to evade the requirement of an entirely clear winged tip by adding candy-colored wings. Accordingly, the Court concluded that DXM had unequivocally "breached the 2016 Settlement Agreement when they distributed and sold the 2018 Accused Mixing Tips." (Summary Judgment Order at 13, 16.)

### F. Mixpac's Alleged Post-A&N Trading Conduct

At bottom, DXM's Amended Counterclaims rest on three alleged courses of conduct by Mixpac following A&N Trading. First, DXM alleges that Mixpac has improperly "continued to maintain, enforce, and renew" the Candy Color Registrations. (Am. Countercl. ¶ 27). Specifically, DXM alleges that Mixpac filed a declaration in February 2024 to maintain U.S. Registration No. 5,420,300 stating "that the mark was still in use in commerce" and also filed an identical declaration for U.S. Registration No. 4,674,109 (together, the "Section 8 Declarations"). Although DXM does not allege either mark was out of use, DXM claims that Mixpac's Section 8 Declarations did not disclose the Court of Appeals' functionality

holding in A&N Trading, which DXM alleges to be "concealment of a material fact which violates 37 C.F.R. 10.18(b)." DXM further alleges that the USPTO "would not have renewed the Registration had the concealed fact been disclosed." (Id.)

Second, DXM alleges that Mixpac has separately maintained exclusion orders with the U.S. Customs and Border Protection. (Id.) DXM alleges no new recordation or renewal with U.S. Customs and Border Protection ("CBP") after February 18, 2021, and indeed concedes that the recordals predate the Court of Appeals' decision in A&N Trading. (Opp. at 9.) Instead, DXM's theory is that Mixpac's existing recordals deter third parties from importing color-coded tips, and that "[c]ustomers of DXM in Korea have been fearful of buying from DXM, in the reasonable belief that they cannot import into the United States." (Am. Countercl. ¶ 27.)

Third, DXM alleges that Mixpac has advertised its tips in a catalog pairing each Candy Color with a diameter and later added that the colors are "available upon request for mixing tips in any diameter," which DXM claims is a "sham attempt to uncouple color from size." (Id.)

**G. The Court's Leave Order**

Citing this purportedly new conduct by Mixpac, DXM sought leave in March of 2025 to amend its dismissed counterclaims. DXM's request for leave proposed adding two buckets of counterclaims: one based on new violations (consisting of Mixpac's post-decision

maintenance and renewal of the registrations and its CBP recordations), and a second set of claims based on Mixpac's pre-A&N Trading conduct but alleging a new theory of harm. (Dkt. 134; Dkt. 142 (the "Leave Order") at 3-4.) The Court granted leave in part, holding that "in the interest of consolidating all the issues between the parties," DXM could amend its counterclaims to allege any "new violations of the antitrust laws." (Leave Order at 5 (emphasis added).) However, the Court denied leave to re-plead any earlier violations, which the Court held would "certainly be deemed untimely." (Id. at 6.)

**H. DXM's Amended Counterclaims**

To that end, DXM filed the Amended and Supplemental Answer and Counterclaims on November 11, 2025, asserting nine counterclaims. Six of DXM's amended counterclaims seek declaratory relief for (i) non-infringement (Counterclaim One), (ii) functionality (Counterclaim Two), (iii) unenforceability and cancellation (Counterclaim Three), (iv) no breach of the Settlement Agreement (Counterclaim Seven), (v) trademark misuse by color depletion (Counterclaim Eight), and (vi) unclean hands (Counterclaim Nine). In addition to these declaratory claims, DXM seeks damages arising from alleged (i) monopolization and attempted monopolization under Section 2 of the Sherman Act (Counterclaim Four), (ii) unfair competition (Counterclaim Five), and (iii) interference with business relations arising from an

alleged eBay delisting (Counterclaim Six). (Dkt. 145; Am. Countercl. ¶¶ 12-54.) DXM's answer also asserts eight affirmative defenses, including that "[t]he equitable relief sought by Plaintiff is barred by its unclean hands." (Am. Ans. at 15.)

Mixpac moved to dismiss all nine counterclaims in November of 2025. Following settlement discussions by the parties, the Court reserved ruling on Mixpac’s motion pending the outcome of the discussions. The parties have subsequently advised that the settlement discussions have concluded and were unsuccessful. Accordingly, the Court treats the motion as ripe for ruling.[5]

## LEGAL STANDARD

### A. Rule 12(b)(6)

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The Court accepts well-pleaded allegations as true but disregards threadbare recitals of the elements of a claim. Id. The same standard governs a counterclaim, which, if it sounds in fraud, must also state "with particularity the

[5] On April 1, 2026, the Court granted Mixpac a protective order staying discovery on Counterclaims Three and Four, and on any other antitrust count or defense, pending resolution of this motion. (Dkt. 159.)

circumstances constituting fraud." Fed. R. Civ. P. 9(b); see Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).

The Court may consider the pleading, documents attached to or incorporated in it, and documents integral to it, DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010), and may take judicial notice of public records, including filings in other tribunals, but "not for the truth of the matters asserted . . . but rather to establish the fact of such litigation and related filings." Glob. Network Commc'ns. Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006).

**B. Fraud in Maintaining a Trademark Registration**

A registration "shall remain in force for 10 years" unless the owner fails to file affidavits meeting the requirements of subsection (b). 15 U.S.C. § 1058(a). Such an affidavit must "state that the mark is in use in commerce," identify the goods and services, and be accompanied by specimens and the prescribed fee; alternatively, it may make the showing of excusable nonuse that subsection (b)(2) prescribes. Id. § 1058(b). Mixpac proceeded under subsection (b)(1), and the statute imposes no other content requirement.

In this Circuit, "'[f]raud in procuring a trademark registration . . . occurs when an applicant knowingly makes false, material representations of fact in connection with his application.'" MPC Franchise, LLC v. Tarntino, 826 F.3d 653, 658

(2d Cir. 2016) (quoting In re Bose Corp., 580 F.3d 1240, 1243 (Fed. Cir. 2009)). Mere negligence, however, does not suffice; the representation must be made "with the intent to deceive the PTO" and "indicate a 'deliberate attempt to mislead the [PTO],'" proved by clear and convincing evidence. MPC Franchise, 826 F.3d at 659-60. The same standard governs fraud in obtaining a renewal of a mark. Torres v. Cantine Torresella S.r.l., 808 F.2d 46, 48 (Fed. Cir. 1986). A party attacking a competitor’s Section 8 filing must therefore plead, with particularity, a statement in it that was false, known to be false, and made with intent to deceive the USPTO.

**C. The Sherman Act**

Section 2 of the Sherman Act forbids monopolizing or attempting to monopolize "any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. Attempted monopolization requires predatory or anticompetitive conduct, specific intent to monopolize, and a dangerous probability of achieving monopoly power, which turns on the relevant market and the defendant's ability to lessen or destroy competition in it. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993); accord PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). Enforcement of intellectual property procured by fraud on the Patent Office may violate Section 2 if the other elements of a Section 2 claim are present. Walker

Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174 (1965).

**D. Law of the Case and the Scope of Leave To Amend**

A court generally adheres to its own rulings at later stages of the same case absent "cogent and compelling reasons," such as an intervening change in law, new evidence, or "the need to correct a clear error or prevent manifest injustice." Johnson v. Holder, 564 F.3d 95, 99-100 (2d Cir. 2009) (quoting United States v. Quintieri, 306 F.3d 1217, 1225, 1230 (2d Cir. 2002)). Although leave to amend is given "when justice so requires," Fed. R. Civ. P. 15(a)(2), leave to replead after dismissal should be denied where "[t]he problem with [the] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000).

**DISCUSSION**

**A. Counterclaims One, Two, Five, and Six Are Untimely and Unauthorized by the Leave Order**

As a threshold matter, Mixpac argues that the operative allegations of Counterclaims One, Two, Five, and Six do not assert any new causes of action and are identical in substance to those of counterclaims dismissed by the September 2022 Order. DXM's opposition never mentions these counterclaims. That alone is reason enough to dismiss them. In any event, the Leave Order only authorized DXM to re-plead "new violations of the antitrust laws"

and expressly denied leave as to "earlier violations." (Leave Order at 5-6.) Accordingly, Counterclaims One, Two, Five, and Six are DISMISSED WITH PREJUDICE.

**B. Counterclaims Three and Four Fail as Pleaded**

Counterclaims Three and Four each hinge on DXM's theory that Mixpac's Section 8 Declarations were fraudulent and that such fraud, along with a failure to withdraw the earlier CBP recordations, constitutes the predatory or anticompetitive conduct required for a Section 2 Sherman Act claim. (Am. Countercl. ¶¶ 23, 27; Opp. at 3-10.) As set forth below, DXM's theory fails as pleaded.

**i. DXM Fails To Allege a False Statement to the USPTO**

First, the Court agrees that DXM has not alleged plausibly a false statement to the USPTO. Certainly, Mixpac's statement that each mark was still "in use" is not alleged to be false; by DXM's own allegations, Mixpac continues to use and to defend the marks. (Am. Countercl. ¶ 27.) And a statement of continued use is precisely (and only) what a Section 8 declaration requires. 15 U.S.C. § 1058(b)(1)(A). As to DXM's argument that Mixpac failed to draw the USPTO's attention to the Court of Appeals' decision, that alone cannot ground DXM's fraud claim because the Court concludes Mixpac had no statutory duty to alert the USPTO to an adverse appellate ruling in the context of a Section 8 declaration. Section 8 contains no statutory requirement that a registrant

disclose an unfavorable ruling from the Court of Appeals, let alone one that has not produced a court-ordered cancellation from the district court below.

Indeed, Congress knew how to require a registrant to speak to adverse decisions and pending proceedings, as it did in Section 15 "incontestability" declarations. See, e.g., 15 U.S.C. § 1065(1) (requiring that an owner asserting incontestability certify that "there has been no final decision adverse to the owner's claim of ownership of such mark for such goods or services, or to the owner's right to register the same or to keep the same on the register"). The fact that Congress did not import a similar duty into Section 8 further supports that Mixpac had no statutory duty to affirmatively disclose the A&N Trading decision in its Section 8 declaration.

DXM also suggests that Mixpac's failure to disclose the decision may be actionable as "inequitable conduct." (Opp. at 5 - 7). But the "inequitable conduct" theory appears to derive from patent proceedings "when applicants or their attorneys breach their duty 'to prosecute patent applications in the [Patent Office] with candor, good faith, and honesty'." Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 98 F. Supp. 2d 362, 391 (S.D.N.Y. 2000), aff'd and remanded, 237 F.3d 1359 (Fed. Cir. 2001) (quoting Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.3d 28, 30 (Fed. Cir. 1999). That affirmative disclosure duty, in turn, arises

from a patent-specific rule of practice that imposes a broader duty on patent applicants to "disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56(a). Thus, patent applicants who fail to disclose material facts may be said to act inequitably, even if those nondisclosures do not rise to the level of common-law fraud. Cf. Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1069 (Fed. Cir. 1998) ("Inequitable conduct in fact is a lesser offense than common law fraud . . . ."); Muhlenberg Coll. v. Sportswear, Inc., 2015 WL 713842, at *3 (E.D. Pa. Feb. 19, 2015) ("In the patent context, courts consider 'inequitable conduct' that may be 'broader than common law fraud' . . . .") (emphasis added).

A trademark registration under Section 8, by contrast, is subject only to the general USPTO requirement that documents filed with the USPTO contain statements that the applicant believes or knows to be true. See 37 C.F.R. § 11.18. But Section 11.18 does not require the applicant to disclose all material facts (including those adverse) that may bear on the mark's protectability. Thus, fraud in the trademark registration context requires a knowingly "false, material representation[]" to the USPTO. MPC Franchise, LLC v. Tarntino, 826 F.3d 653, 658 (2d Cir. 2016). DXM cites no case law suggesting, at least in this Circuit, that the lesser standard of inequitable conduct would apply in the trademark

registration context. In the absence of any supporting precedent, the Court declines to extend the theory here.

Accordingly, to the extent DXM's antitrust counterclaims allege fraud on the USPTO, those counterclaims must fail.

**ii. Mixpac Had No Duty To Withdraw the CBP Recordals**

Independently, DXM alleges that Mixpac's "[m]aintenance of CBP recordals constitutes affirmative enforcement" because the recordations, unless withdrawn, continue to have effect. (Opp. at 9.) But DXM cites no authority imposing a duty to withdraw a lawfully obtained recordation upon an adverse appellate decision in litigation with a third party prior to formal cancellation with the TTAB. The governing regulation merely states that a recordal remains in force concurrently with the registration and "shall be canceled if the trademark registration is finally canceled or revoked," 19 C.F.R. § 133.4(b)-(c) (emphasis added), which has not happened yet. While DXM may be understandably frustrated that the USPTO has not yet cancelled the registration in light of pending district court litigations, it is not unusual for there to be significant "lag time" between an adverse appellate ruling and final cancellation at the USPTO. Certainly, DXM does not allege that Mixpac engaged in any wrongful conduct intended to delay or frustrate the cancellation of its mark in the wake of A&N Trading.

Because DXM fails to plead any anticompetitive act from which an antitrust claim would be actionable, Counterclaim Four is DISMISSED WITH PREJUDICE.

**iii. Counterclaim Three's Request for Declaratory Relief Fails**

With DXM's Sherman Act claims dismissed, all that remains of Counterclaim Three is a request to declare the Candy Color Registrations unenforceable and cancelled because the Candy Colors lack secondary meaning and are functional. (Am. Countercl. ¶¶ 20–22.) The Court's September 2022 Order already dismissed DXM's functionality counterclaim, (September 2022 Order at 20), and the Court adhered to A&N Trading in dismissing Mixpac's infringement claims as to the marks litigated there. (Id. at 12.) DXM identifies no intervening change in law, new evidence, or clear error warranting reconsideration of that decision. Moreover, Counterclaim Three is also beyond the scope of the Leave Order, which, as the Court noted, permitted amendment to plead "new violations of the antitrust laws," not to reassert a cancellation claim the Court had already dismissed. (Leave Order at 5.)

Accordingly, Counterclaim Three is DISMISSED WITH PREJUDICE.

**C. Counterclaim Seven**

Counterclaim Seven seeks a declaration that DXM's new colored tips "are not proscribed by the operative terms of the Settlement Agreement," on the theory that only paragraphs 5 and 8 bind future

conduct and reach only confusingly similar products. (Am. Countercl. ¶¶ 43-44.) The Court has already held that DXM's purportedly new tips are in fact proscribed by the Settlement Agreement, (see PI Order at 15) and that the Agreement and the Consent Injunction "are not premised on the validity of Mixpac's Candy Colors marks" and survive A&N Trading, (September 2022 Order at 14-15). Accordingly, Counterclaim Seven is also foreclosed by the Court’s prior rulings and is DISMISSED WITH PREJUDICE.

**D. Counterclaim Eight**

Counterclaim Eight seeks a declaration that Mixpac, by asserting rights in the six Candy Colors "and all shades close to these exact colors," "virtually depletes all of the available colors under a color depletion theory, and constitutes misuse of the trademark system." (Am. Countercl. ¶¶ 46-51.) However, as Mixpac notes, a color depletion theory would appear to be coextensive with functionality. Indeed, "if a 'color depletion' or 'color scarcity' problem does arise -the trademark doctrine of 'functionality' normally would seem available to prevent the anticompetitive consequences that [the] argument posits." Qualitex Co. v. Jacobson Prods. Co., 514 U.S. 159, 169 (1995).

Here, the Court dismissed DXM's functionality counterclaim in 2022, and the Court of Appeals has held that the colors at issue are functional. A further declaration that the colors are unprotectable on color-scarcity grounds would thus clarify nothing

in the parties’ legal relations. Accordingly, Counterclaim Eight is DISMISSED WITH PREJUDICE.

**E. Counterclaim Nine**

Counterclaim Nine seeks a declaration that Mixpac's conduct in "maintaining, enforcing, and renewing" the registrations after the Court of Appeals’ decision, and in claiming substantially all available colors, constitutes unclean hands "barring all equitable and monetary relief to Medmix." (Am. Countercl. ¶¶ 53-54.) But "[u]nclean hands . . . is not a cause of action; it is an equitable defense to equitable claims." Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 749 F. Supp. 1243, 1253 (S.D.N.Y. 1990), aff’d, 17 F.3d 38 (2d Cir. 1994). Indeed, DXM has already pleaded unclean hands as an affirmative defense.

Accordingly, Counterclaim Nine is DISMISSED WITH PREJUDICE.

**F. Leave To Amend**

DXM requests leave to amend, in a single paragraph of its opposition, citing Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC, 797 F.3d 160, 191 (2d Cir. 2015). (Opp. at 14.)

A party ordinarily should be afforded one opportunity to replead after a first dismissal. Loreley, 797 F.3d at 190-91. But DXM already sought and obtained leave to assert these counterclaims by a letter previewing the very theories the Court has now rejected. More to the point, "[t]he problem with [DXM's]

causes of action is substantive; better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d, 99,112 (2d Cir. 2000). DXM identifies no additional fact it would plead that could change the Court's analysis. Accordingly, leave to amend is DENIED as futile.

**CONCLUSION**

The Court is not unsympathetic to the position in which DXM finds itself as a result of the bargain that it struck. However, DXM is not without recourse. DXM remains free to seek cancellation before the TTAB of any registered marks that ought to be vacated in light of A&N Trading, which may in turn address the vestigial CBP recordations of which DXM complains. Ultimately, any effect of the A&N Trading decision on the validity of Mixpac's marks at large is a matter for the TTAB.[6] It has no bearing on what is, at bottom, a litigation to enforce a bargained-for settlement agreement between Mixpac and DXM.

The Court has considered DXM's remaining arguments and finds them to be without merit. For the foregoing reasons, Mixpac's motion to dismiss (Dkt. 146) is GRANTED. All of DXM's

[6] Certainly, the Court agrees with DXM that proceedings at the USPTO should not remain in limbo forever. Presumably, DXM may seek to intervene in the A&N Trading matter before Judge Kaplan and request that a final judgment enter in that matter so that the TTAB cancellation proceeding may go forward. But to the extent that the TTAB has stayed the cancellation proceeding because the TTAB mistakenly believes that this Court must relitigate the mark's validity in this matter, the Court welcomes DXM to propose a path forward that may allay the TTAB's concerns and facilitate resolution of the cancellation proceeding.

counterclaims are DISMISSED WITH PREJUDICE and leave to amend is DENIED.

Within seven days of this Order, the parties shall confer and advise the Court by joint letter how they propose to proceed.

The Clerk of the Court shall close Dkt. 146.

**SO ORDERED.**

Dated: New York, New York
September 30, 2026

LORETTA A. PRESKA
Senior United States District Judge